**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

SHEA REBECCA BROWN,

       Plaintiff,

                           Case No. 3:13-cv-915-J-34MCR

vs.

RUDOLPH DAVIS, individually, et al.,

       Defendants.

_____/

## O R D E R

    **THIS CAUSE** comes before the Court as a race and gender discrimination action

brought pursuant to 42 U.S.C. §§ 1981 and 1983. The matter is presently before the

Court on two motions for summary judgment: Defendant Rudolph Davis's Motion for

Summary Judgment, filed on May 18, 2015 (Doc. 69; Davis Motion), and Defendant

Carlton Tunsil's and City of Lake City, Florida's Motion for Summary Judgment (A

Dispositive Motion) with Supportive Memorandum of Law, filed on May 18, 2015 (Doc.

68; Tunsil and Lake City Motion) (collectively, Motions).  Plaintiff filed its Consolidated

Response to the Motions and Notice of Filing exhibits in support on July 10, 2015 (Doc.

75; Response, Doc. 76), and Defendant Davis, with leave of Court, filed a Reply (Doc.

79; Reply).  Accordingly, the Motions are ripe for consideration.

## I.     Background[1]

The City of Lake City, Florida (Lake City) hired Plaintiff Shea Rebecca Brown (Brown), a Caucasian female, as a police officer with the Lake City Police Department (LCPD) in March of 2008.  Deposition of Shea Brown dated June 23, 2014 at 11 (Doc. 68-11; Brown Dep.).  According to Brown, Defendant Rudolph Davis (Davis), a black male who then served as a lieutenant and later become the captain of LCPD, disliked the fact that LCPD hired a caucasian female because he wanted LCPD to hire his friend, Greg Williams, a black male.  Brown Dep. at 102–03, 175.  Further, John Blanchard (Blanchard), who was a sergeant with LCPD at the time of Brown's employment, testified that Davis had "issues with women that had authority" and believed that women should not be in law enforcement.  Deposition of John Blanchard dated June 24, 2014 at 7, 67–70. (Doc. 76-6; Blanchard Dep.)

In early April, 2009, Brown's supervisor, Andy Miles (Miles), drafted an intradepartmental memo stating that Brown's performance in her first year was satisfactory and recommending that Brown should be deemed to have completed her probationary period.  Intra-Departmental Correspondence Form dated April 9, 2009 (Doc. 68-1; Exhibit A; Probation Memo).  On April 13, 2009, Davis, then a lieutenant, wrote "Concur" on the memo, and on April 15, 2009, Gary Laxton (Laxton), who at the time was the Chief of LCPD, wrote "Agree."  Id.

---

[1] For the purposes of resolving Defendants' Motions, the Court views all disputed facts and reasonable inferences in the light most favorable to Brown. However, the Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

**Brown's Arrest**

On April 23, 2009, Officer Jason Golub (Golub) responded to a call from the Parole and Probation Office ("Parole and Probation") to arrest King David Bradley (Bradley)[2] and transport him from Parole and Probation to the jail.  Brown Dep. at 22, 42.  As Golub effected the arrest, he discovered a bag of marijuana and unidentified pills on Bradley's person.  Id. at 23, 26. At some point, Golub informed dispatch of the additional charges against Bradley.  Id. at 28.  According to Brown, Golub made this call to dispatch before she came on duty, and Golub never told Brown that he had informed anyone that he had found marijuana on Bradley's person.  Id. at 26, 28–29.  When Brown came on duty, Golub asked her to transport Bradley from the police department to the jail because Golub's shift was ending.  Id. at 22; see also Blanchard Dep. at 53–54.  Brown met Golub at the police department, where he gave her the marijuana and pills.  Brown Dep. at 23. According to Brown, this was the first time Golub said anything about the marijuana or pills.  Id. at 23–24.  Golub weighed the marijuana and determined it to be a misdemeanor amount, rather than a felony amount.  Id. at 25.  According to Brown, Golub, who was in a hurry, then told Brown "[d]o what you want with it," referring to the marijuana and pills, before ending his shift.  Id.

According to Brown and Blanchard, LCPD had an unwritten policy whereby police officers could use their discretion to decide whether to charge an individual with possession of a misdemeanor amount of marijuana.  Id. at 52–53; see also Blanchard Dep. at 46, 56.  If the officer chose not to charge the individual, the officer could destroy

---

[2] The parties' filings and depositions refer to the arrestee as "King Bradley," "King David Bradley," and "David Bradley."  As his precise name is not material, the Court will simply refer to him as Bradley and to the incident as the Bradley arrest.

the marijuana so long as the officer did so in the presence of another officer.[3]   Id.

Knowing this unwritten policy, Brown chose not to charge Bradley with possession of the

misdemeanor amount of marijuana.   Brown Dep. at 154.   Brown then threw away the

pills, which she had determined to be water pills, and after she transported Bradley to the

jail, she destroyed the marijuana in the presence of Officer Ivan Useche (Useche).   Id. at

32, 38–39.   Brown testified that she did not believe she told Useche how she came to

possess the marijuana or that she was destroying the marijuana pursuant to the unwritten

policy.   Brown Dep. at 40–41.   She also testified that Useche never asked about the

marijuana or said anything to Brown regarding the destruction of the marijuana.   Id. at

41.

Brown did not hear anything more about the Bradley arrest until May 14, 2009,

when then-Chief Laxton informed her that he was placing her on administrative leave

with pay because the Florida Department of Law Enforcement (FDLE) had commenced

a criminal investigation against her for tampering with evidence.   Id. at 42–43; see also

id. at 59–60.   Brown testified that the FDLE eventually "cleared [her] of any wrongdoing"

and advised Robert "Skip" Jarvis, the State Attorney for the Third Judicial Circuit, that the

FDLE "didn't have anything to proceed with."   Id. at 50; see also Tunsil Dep. at 29–30.

Despite the FDLE's recommendation, Jarvis opted to conduct his own investigation.

Brown Dep. at 60, 143–44.   At the conclusion of his investigation, Jarvis, in his capacity

as State Attorney, filed an information charging Brown with tampering with evidence, a

third-degree felony, on July 7, 2009.   Information for: Tampering with Evidence dated

---

[3] Davis testified that there was no such policy in place, and Tunsil testified that he had never heard of the unwritten policy.  Deposition of Rudolph Davis dated April 6, 2015 at 90–91 (Doc. 68-13; Davis Dep.), Deposition of Carlton Tunsil, dated June 24, 2014 at 12–13 (Doc. 68-12; Tunsil Dep.).  However, for purposes of summary judgment, the Court accepts the testimony regarding the existence of the unwritten policy.

July 7, 2009 (Doc. 68-5; Information).  Consistent with the charge, Jarvis issued a <u>capias</u> for Brown's arrest.  <u>Id.</u>  Brown turned herself into the jail and was arrested on July 7, 2009.  Brown Dep. at 48–49, 77.  The criminal case against Brown went to trial, but resulted in a mistrial in December of 2009.  <u>Id.</u> at 79.  A year later, in September of 2010, the court dismissed the case.[4]  Brown Dep. at 77–80.  Brown acknowledges that none of the Defendants, nor any LCPD officer, were involved in the decision of the FDLE or Jarvis to criminally investigate and charge Brown.  Brown Dep. at 60, 143–44, 187; <u>see also</u> Davis Dep. at 99.

Because of the criminal charge against Brown, on July 8, 2009, Tunsil placed Brown on administrative leave without pay.  LCPD Memorandum dated July 8, 2009 (Doc. 68–6).[5]  Then, on July 10, 2009, prior to the completion of the criminal case against Brown, Tunsil directed Blanchard to conduct an Internal Affairs investigation to determine whether Brown had violated LCPD policies in her handling of the Bradley arrest and the destruction of the marijuana.  IA-09-07 dated July 10, 2009, at 2, 8–9 (Doc. 68-7; Marijuana IA); <u>see also</u> Blanchard Dep. at 17–20.  Blanchard conducted the Marijuana IA, and on August 24, 2009, sustained the following LCPD policy violations: (1) "Neglect of Duty," for failure to take appropriate action at a crime scene, level 3; (2) "Recovered Property/Evidentiary Material," for failing to turn over evidentiary material, level 3; (3) "On/Off Duty Conduct – Morale/Efficiency – Image/Public Confidence," for not filing charges against Bradley and destroying evidence, level 5; and (4) "Felonies," for

---

[4] Brown testified that after the mistrial, the court involuntarily dismissed the charge against Brown because the State Attorney's Office violated her speedy trial rights. Brown Dep at 79.

[5] Tunsil became LCPD Chief on June 26, 2009. Davis Dep. at 22.  At this time, Tunsil was also the active Chief of the Lake City Fire Department. <u>Id.</u> at 26; 28–29.

destroying evidence in contravention of Florida Statutes Section 918.13, thus committing a crime defined as a felony, whether chargeable or not, level 5.  Id. at 11–13.  The only complaint on which Blanchard did not sustain a violation was "Untruthfulness," a level 5 violation.  Id. at 6, 13.

Blanchard sustained the level 3 "Neglect of Duty" violation because LCPD Policy 212.45 stated that "Employees shall give attention to the performance of duty.  Violations of this section shall include but are not limited to: failure to take appropriate action on the occasion of a crime scene, disorder, or other act or condition deserving attention."  Id. at 11.  Blanchard found that:

> Officer Brown should have known the prisoner was searched in the presence of the Probation Officer, making the drugs evidence. Notwithstanding, Officer Brown's thought of destroying the small amount of contraband that was not evidence was not done according to Lake City Police Department practice.  Officer Ivan Useche was not informed as to being a witness, nor the facts of [Brown's] actions.

Id. at 11–12.

Blanchard sustained the level 3 "Recovered Property/Evidentiary Material" violation against Brown because LCPD Policy 212.71 stated that:

> Employees shall turn over . . . all lost, stolen, recovered, abandoned or evidentiary material which comes into the possession of a department member as a result of the performance of departmental duties. . . . No employee shall . . . destroy or otherwise dispose of any property except in accordance with specified procedures established within the Property and Evidence general order (36).

Id. at 12.  The Property and Evidence general order section regarding Narcotics stated that any officer who seized and brought narcotics to LCPD "for placement into the property/evidence room" should first weigh the narcotics in the presence of another officer and then prepare a property receipt on the evidence before sending the narcotics

6

to the FDLE's laboratory for analysis.  Id. at 12–13.  Although Brown was unaware that

the marijuana was seized in the presence of Probation and Parole and did not know that

Golub intended to charge Bradley with a crime, Blanchard found that:

> Officer Jason Golub advised Lake City Police Dispatch that he had a, "BM10-15***** On new charges."  This made the drugs evidence.  Officer Brown maintains she was told to do as she wanted with the case.  Officer Golub does not have that authority at this point.  None of this policy was documented correctly.

Id. at 13; see also Brown Dep. at 26–27.

Blanchard also sustained the level 5 "On/Off Duty Conduct – Morale/Efficiency –

Image/Public Confidence," because LCPD Policy 213.49 stated:

> No employee shall engage in conduct on or off-duty which adversely affects the morale or efficiency of the department; nor shall any employee engage in conduct on or off duty which has a tendency to destroy public respect for the employee and/or the department and/or destroy confidence in the operation of the municipal service or which tends to affect the employee's performance in the work setting whether or not such act is a criminal offense.

Marijuana IA at 13.  Blanchard found that Brown violated this policy because Golub

arrested Bradley and seized evidence, but Brown did not file charges and destroyed the

evidence.  Id.  Blanchard found that even if Golub told Brown to "do as she wanted with

the case," Golub did not have the authority to do so.  Id.

Finally, Blanchard sustained the level 5 "Felonies" charge against Brown.  Section

918.13, Florida Statutes stated:

> Tampering with or fabricating physical evidence. –
> (1) No person, knowing that a criminal trial or proceeding or an investigation by a duly constituted prosecuting authority, law enforcement agency, grand jury or legislative committee of this state is pending or is about to be instituted, shall:
> (a) Alter, destroy, conceal, or remove any record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation; or

> (b) Make, present, or use any record, document, or thing, knowing it to be false.
> (2) Any person who violates any provision of this section shall be guilty of a felony of the third degree . . . .

Fla. Stat. § 918.13 (2009).  LCPD Policy 213.77 stated that "Employees shall not commit a violation of . . . a crime defined by state or federal law as a felony, whether chargeable or not."  Marijuana IA at 13.  Blanchard found that Brown violated this policy because "Officer Brown did destroy evidence in violation of Lake City Police Department Policy 212.71 and Florida S.S. 918.13.  Officer Brown states that she was told to do what she wanted with this case by Officer Golub.  Officer Golub after making the arrest cannot authorize her to do this."  Id.

Blanchard did not sustain a violation on the charge of "Untruthfulness."  Id.  LCPD Policy 213.47 stated: "Employees are required to be truthful at all times, to supervisors, subordinates, or other city employees whether under oath or not."  Id.  Blanchard found that Brown's account of the Bradley arrest was consistent with the statement of an eyewitness, Officer Joe Lucas, who confirmed that Golub told Brown to "do with the case as she want[ed]."  Id.  Golub told Blanchard that he called Brown after the Bradley transport and "told her that she had completed her task quickly. . . . [and] she told him she was going to do the [arrest] affidavit later."  Id.  However, Brown asserted to Blanchard that although Golub called her after she left the jail, she never told him she would do an affidavit.  Id.  Blanchard found that his investigation "produced insufficient facts to prove or disprove the allegations [that Brown violated the Untruthfulness policy]," and thus recommended the violation not be sustained.  Id.

8

**Brown's First Domestic Incident**

On May 5, 2009, Brown called Officer Paul Kash (Kash) and requested his intervention in a dispute between Brown and her husband. Brown Dep. at 69–70.[6] Brown testified that her husband would not give her the car keys, and she called Kash to help her get the keys because she was worried that the situation would escalate into domestic violence. Id. Kash came to Brown's home and assisted her in obtaining the car keys and leaving the residence without physical violence. Id. at 70–71. Following the incident, Kash wrote a report detailing his involvement and Brown's account of the incident. See generally Kash Report.

LCPD did not immediately undertake disciplinary action against Brown as a result of this incident. Brown Dep. at 71. However, following the incident, Davis, who by that time had been promoted to LCPD Captain, second-in-command under Chief Tunsil,[7] requested that Brown write a statement about her husband's involvement in the incident. Id. at 64–66, 72. At the time, Brown's husband was an employee of the Columbia County Sheriff's Department. Id. at 12. Davis testified that his intent in requesting this statement was to assist the sheriff's department in their investigation into the incident. Davis Dep. at 33–34. However, Brown testified that she did not know why Davis wanted her to write a statement, but she believed Davis wanted to get her husband in trouble. Brown Dep. at 65, 66, 165–66. Brown refused to write a statement as requested by Davis. Id. at 64–

---

[6] In her deposition, Brown confused the dates of the two domestic violence incidents at issue in this case, reversing the two events chronologically. Brown Dep. at 61, 70. However, the record discloses that the first incident occurred on May 5, 2009, and involved Brown and Kash, while the second incident occurred on August 14, 2009, and involved Brown and Officer Larry Shallar. See Offense Report dated May 5, 2009 (Doc. 68-2; Kash Report), Personnel Complaint PC-09-06, dated August 24, 2009 at 19–24 (Doc. 69-13; Shallar Report).

[7] LCPD promoted Davis to Captain on April 20, 2009. Davis Dep. at 21.

67, 161–63.  Davis then ordered Brown to write the statement, and when she refused, he told her that she "was failing to follow a direct order" and wrote a memorandum to Chief Laxton recommending that an internal investigation be conducted against Brown for insubordination.  Id. at 64–67, 161–63; see also Memorandum dated May 6, 2009 (Doc. 69-4).  LCPD never investigated or disciplined Brown for this alleged insubordination. Brown Dep. at 65–67, 162–63.

Before Brown refused to write this statement, Brown and Davis had had relatively little interaction.  Id. at 68–69.  After her refusal to comply with Davis's order, both Brown and Davis were angry, and Corporal Tim Murphy, Brown's direct supervisor, told Brown that she had "just messed up" and that she "better watch [her] back, because [Davis was] going to come after [her] because [she] bucked his authority."  Id. at 65, 67.  Brown testified: "I knew that any chance Davis got to get me he would, at that point. . . . Because I didn't do what [Davis] asked me to do."  Id. at 67.  When asked if there was any other reason that Davis would be out to get her, Brown stated: "I knew that you were either – if you were on Davis's good side, he would do whatever.  If you were on Davis's bad side, . . . you needed to be careful."  Id. at 67–68.  Brown also testified that "the problems [with Davis] started where I knew it was going to be an ongoing issue when [Davis] asked me to write the letter against my husband, which was before the [Bradley arrest]."  Id. at 166.

**Damage to Brown's Computer**

On July 16, 2009, Davis ordered Blanchard to complete an Internal Affairs investigation regarding damage to Brown's LCPD-issued computer.  IA-09-07 dated July

16, 2009, at 7 (Doc. 68-8; Computer IA).[8]  While Brown was on unpaid administrative leave due to the ongoing criminal investigation, LCPD ordered her to return her computer to the department so that another officer could use it.  Davis Dep. at 48.  Officer Steve Shaw (Shaw), who was the LCPD accreditation manager and in charge of issuing computers and other equipment to officers, received the computer and noted that two keys had become detached from the computer.  Id. at 48, 50.  Shaw informed Davis of the damage and showed him the damaged keys.  Id.  After seeing the damage, Davis recommended to Tunsil that he institute an internal affairs investigation.  Id. at 51–53.  Blanchard testified that Davis thought Brown had intentionally damaged the computer.  Blanchard Dep. at 36–37.  However, Davis stated that the investigation was not because Brown intentionally damaged the computer, but because "it was damaged and [LCPD was] not advised of the damage." Davis Dep. at 54.  In the investigation, Brown explained to Blanchard that the computer keys accidentally fell off because her computer stand was the wrong size, and Blanchard confirmed that the stand was the wrong size and that the computer was held on to the stand by a bungee cord.  Brown Dep. at 116; Computer IA at 5.  Brown told Blanchard that the damage had occurred two days earlier, on July 14, 2009; however, she had not reported the damage before turning her computer in to LCPD.  Id. at 5–6.

On August 25, 2009, Blanchard sustained two LCPD policy violations against Brown: 1) "Care of Equipment," for failing to properly care for issued equipment, level 1;

---

[8] Davis testified that he did not suggest to Chief Tunsil that an Internal Affairs investigation should take place, but that "it was more of an agreement between the both of us [Davis and Tunsil] that we initiate an investigation." Davis Dep. at 52–53.  Davis signed the memorandum ordering Blanchard to conduct the Computer IA.  Computer IA at 7.  Tunsil testified that he "would direct [Davis], [w]e need to look into this and we need to take care of this, so have one of your investigators do it."  Tunsil Dep. at 33.

and 2) "Departmental Property – Reporting Damage/Return," for failing to immediately report in writing all damage to equipment, level 3. Id. at 5–6. Blanchard found that the improper stand size and Brown's use of a bungee cord to hold the computer in place most likely caused the computer keys to detach. Id. at 6. Although Blanchard found that the damage was most likely unintentional, he found that Brown did not sufficiently care for her computer so as "not [to] contribute to the loss or damage to department property." Thus, Blanchard found that Brown had violated LCPD Policy 212.11, "Care of Equipment," which stated: "Employees shall properly care for issued equipment including city uniforms, vehicles, tools and supplies. Employees shall not contribute to the loss or damage to department property by negligence or inattention to duty." Id. at 5–6.

Blanchard also sustained a level 3 violation against Brown because the damage occurred on July 14, 2009, but Brown had not reported the damage by the time she turned her computer in on July 16, 2009. Id. at 6. LCPD Policy 212.61 stated in part: "Employees shall immediately report in writing all damage to vehicles and equipment and file such report which contains all known facts surrounding the cause and nature of the damage. . . ." Id. Because Blanchard found that the damage would be immediately recognizable, he found that Brown should have reported the damage immediately. Id.

Davis testified that he ordered the Computer IA because he heard a rumor that the computer could have been damaged during a domestic incident at Brown's home. Davis Dep. at 51. Although Blanchard conducted the Computer IA as ordered, he testified that he had no knowledge of any LCPD officer being disciplined "for something like the little keys going off." Blanchard Dep. at 38. Blanchard also testified that he told Tunsil that he thought LCPD "was sending the wrong message maybe to everybody; if

they saw that we were doing that with the damage to the computer, and did he know that we were, in fact, talking about the little pieces right there." Id. at 39.  Blanchard testified that Davis's order to do the Computer IA was "sort of the icing on the cake" that made Blanchard believe Davis was harassing or targeting Brown, because Blanchard thought the Computer IA "was just unreasonable. . . . [and] wasn't something worthy . . . of an Internal Affairs investigation." Id. at 50.

### Speeding Tickets

On July 22, 2009, Davis ordered Blanchard to complete an Internal Affairs investigation regarding certain speeding tickets Brown had issued earlier that year.  IA-09-10, dated July 22, 2009 at 2 (Doc. 68-9; Speeding Ticket IA).  In February of 2009, Brown issued several speeding tickets to individuals for driving five miles over the speed limit. Id. at 18–42.  At that time, the clerk's office had issued fine sheets to LCPD officers stating a fine for drivers going one to five miles over the speed limit.  Brown Dep. at 106.  However, in the State of Florida, officers could not write tickets for an individual driving one to five miles over the speed limit—they could only issue a warning. Id.  Some time later, the clerk's office advised Davis of the issuance of the improper tickets and requested that he send Brown to correct them.  Davis Dep. at 54–55.  Davis told the clerk's office that once an officer writes a ticket, the officer cannot change the speed, so he would send Brown to dismiss the tickets. Id. at 55.  Davis then ordered Andy Miles, Brown's direct supervisor, to have Brown dismiss of the improper tickets.  Brown Dep. at 106; Davis Dep. at 55.  According to the Speeding Ticket IA, Miles could not remember the exact words Davis used.  Speeding Ticket IA at 4.  Brown testified that Miles said Davis had ordered her to get the tickets "fixed" and told Blanchard during his investigation

that Miles told her to "take care of the tickets," but testified during her deposition that she knew at that time that Davis wanted the tickets dismissed.  Brown Dep. at 106–07; Speeding Ticket IA at 4.  Davis testified that he told Miles to have Brown "go and dismiss the tickets."  Davis Dep. at 55.

When Brown visited the clerk's office for the first time to take care of the issue, instead of dismissing the tickets, the clerk's office had her change the speed to six miles per hour over the speed limit for each ticket.  Brown Dep. at 106–07, Speeding Ticket IA at 4–5.  After changing the tickets, Brown reported what she had done to Miles, who told Davis what had happened.  Id.  However, Davis told Miles that he had not wanted the tickets changed, but wanted Brown to "dismiss the tickets."  Davis Dep. at 55, Speeding Ticket IA at 4–5; see also Brown Dep. at 106–07.  Brown went back to the clerk's office and attempted to dismiss the tickets, but the clerk's office told her that because some of the tickets had been paid, she could not dismiss or void the tickets.  Speeding Ticket IA at 4–5.  Miles "thought he reported that information back to Capt. Davis," but did not hear about the matter again until July of 2009.  Id. at 4.

In July of 2009, Officer Kash told Davis that he didn't think Brown had dismissed the speeding tickets.  Davis Dep. at 54–55.  Davis had Kash go to the courthouse to see if the tickets were dismissed, and Kash reported back to Davis that the tickets were never dismissed, and instead, the speed number on the tickets had been scratched out and changed from five to six miles over the speed limit.  Id. at 55–57.  As a result, Davis ordered Blanchard to initiate the Speeding Ticket IA.  Speeding Ticket IA at 2.  Davis also made "multiple requests" for Miles to write a statement regarding the tickets, and instituted an Internal Affairs investigation into Miles because Miles "wasn't giving [Davis]

14

the statement he wanted," regarding whether Davis had said to "dismiss" or to "take care of" the tickets.  Blanchard Dep. at 40, 64–66. Blanchard testified that Davis's threat to lodge a formal complaint against Miles "shocked [Blanchard] at the moment." Id. at 40.

On September 9, 2009, after Brown's termination, Blanchard concluded the Speeding Ticket IA and sustained one violation against Brown for committing a level 5 violation of LCPD policy 213.75, which stated in part that "Employees shall not steal, alter, forge or tamper with any kind of police record, report or citation." Id. at 5.  Blanchard found that Brown changed the fine amount by changing the speed amount, and because "[c]hanging the fine amount after the violation has been issued . . . does alter the ticket," Blanchard sustained the violation against Brown.  Speeding Ticket IA at 5–6 (emphasis in original).

**Brown's Second Domestic Incident**

On August 14, 2009, Brown was involved in a second domestic incident at her home.  Shallar Report at 19–21.  She asked a neighbor to call 911 because she felt that an argument between herself and her husband was getting out of control.  Brown Dep. at 61.  Officer Larry Shallar (Shallar) responded to the call.  Id. at 62.  After Shallar's arrival, Brown was able to gather her things and leave the residence without further incident.  Id. at 63.  Shallar completed an official report, but did not detail any physical injuries to either Brown or her husband, and reported that Brown and her husband both stated that the altercation was only verbal.  Shallar Report at 19.

Following the submission of Shallar's report, an unidentified LCPD officer informed Davis that Shallar had observed scratches on Brown's husband's neck at the time of the incident.  Davis Dep. at 58.  Davis ordered Shallar to complete a supplemental report

detailing the injuries Shallar had observed.  Id.  In the supplemental report, Shallar reported that he observed scratches on Mr. Brown's neck and when he asked Mr. Brown how the scratches occurred, Mr. Brown replied that he did not know and that there had been only a verbal altercation.  Id.; see also Shallar Report at 20–21.  Shallar also stated that Davis threatened to commence an Internal Affairs investigation against Shallar if he did not supplement his initial report to include the injuries he observed.  Shallar Report at 20.  Even though Shallar completed the supplemental report, Davis ordered an investigation and violations were sustained against Shallar for failing to include the injuries in his original report.  Davis Dep. at 63–64.  Shallar reported that Davis had also threatened him with an Internal Affairs investigation unless Shallar completed a criminal complaint affidavit against Brown because of the scratches on her husband.  Shallar Report at 21.  However, Shallar reported that because he did not observe blood on Mr. Brown and was unable to determine how old the scratches were, he lacked probable cause to pursue charges against either Brown or her husband and filed the complaint affidavit only because he was "[i]n fear of the threats made by Captain Davis."  Id.  In accordance with Davis's instructions, Shallar sent the complaint affidavit to the State Attorney's Office for review.  Id.; see also Davis Dep. at 59–61.  However, the State Attorney's Office did not file any criminal charge against Brown.  Brown Dep. at 74.

Brown is unaware of any officer at LCPD that had the police called to their residence for domestic violence.  Id. at 72–73.  Tunsil initiated an Internal Affairs investigation against Brown for the two domestic incidents at her residence; however, Tunsil discontinued the investigation after LCPD terminated Brown's employment.  Personnel Complaint, dated September 14, 2009 (Doc. 68-10).

**Brown's Termination**

On August 25, 2009, Davis recommended to Tunsil that Brown's employment be terminated.  Tunsil Dep. at 42–47.[9]  After Davis made the recommendation, Brown had an opportunity for a hearing, which was held on August 28, 2009.  Davis Dep. at 46–47, 69.  On August 31, 2009, following the hearing, LCPD terminated Brown's employment.  Brown Dep. at 80; see also Davis Dep. at 100, Tunsil Dep. at 61–62.  Tunsil signed a letter, likely prepared by Davis,[10] to Brown, stating five reasons for her termination: (1) four Internal Affairs complaints were filed against her in short succession; (2) Internal Affairs sustained several serious policy violations against her; (3) her arrest and actions brought discredit both to LCPD and Brown herself; (4) she had two domestic disturbances at her home in a four-month time period; and (5) her behavior created a liability for the City of Lake City.  Notice of Disciplinary Action dated August 31, 2009 (Doc. 69-6; Termination Letter).  Brown, Tunsil, the Human Resource Director, Carrie Correia, and the City Manager, Wendell Johnson, all signed this letter.  Id.  On August 31, 2009, the same day LCPD terminated Brown's employment, LCPD hired an African-American male, Greg Williams, to work as an officer.[11]  Davis Dep. at 102–03.  Davis, acting as a

---

[9] Although Tunsil signed the memorandum sent to Brown regarding her termination, he testified that Davis prepared the memorandum and that Tunsil "looked over and endorsed [the memorandum], but [he] didn't prepare [it]."  Tunsil Dep. at 41.  Tunsil further testified that in the statement "I am recommending and considering . . . [t]ermination of your employment with the Lake City Police Department," the "I" meant Davis.  Id. at 47.  Davis testified that, at the very least, he and Tunsil "may have recommended [terminations] together."  Davis Dep. at 29; see also id. at 64–65 (responding to the question: "When did you first come to learn that [Brown] may be terminated," Davis replied that "we knew that that was our recommendation, me and [Tunsil], before she had the predisciplinary hearing, because we would have to let her know during that time.").

[10] Tunsil Dep. at 40–41.

[11] Brown alleges that Williams replaced her.  Brown Dep. at 118.  However, Tunsil testified that Williams did "[n]ot necessarily" replace her and Davis testified that he did not hire Williams into Brown's former position.  See Tunsil Dep. at 65; see also Davis Dep. at 75–76, 102–03.

part of a five-member board of LCPD employees that voted on potential hiring decisions, recommended to Tunsil that LCPD hire Williams.[12]  Davis Dep. at 77–78.  Tunsil then likely recommended to the City Manager, Johnson, that LCPD hire Williams, although Tunsil could not specifically recall making such a recommendation.  Tunsil Dep. at 66, Davis Dep. at 77, 78.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[13]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of

---

[12] It is unclear from the record when Davis made the recommendation to hire Williams.  Davis Dep. at 76.  Davis did testify that the advertisement for the position into which he hired Williams "would have been prior to [Brown's] termination."  Davis Dep. at 103.

[13] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 Advisory Committee Note to 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Discussion

In the Amended Complaint, Brown alleges that Defendants Davis and Tunsil intentionally discriminated against her by instituting internal affairs investigations against her and ultimately terminating her because of her gender and race in violation of 42 U.S.C. § 1983, and that the City of Lake City is subject to municipal liability for such

discrimination.  See generally First Amended Complaint and Demand for Jury Trial (Doc. 51; Amended Complaint).[14]  Section 1983 provides a remedy when any person acting under color of state law deprives another of any right, privilege, or immunity secured by the Constitution.  Brown alleges that Defendants violated her "Fourteenth Amendment entitlement to equal rights under the law."  Amended Complaint at ¶ 58, 65, 67.  "The Equal Protection Clause ensures a right to be free from intentional discrimination based upon race . . . and gender."  Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1268 (11th Cir. 2003) (citations and footnote omitted).  As such, the Eleventh Circuit Court of Appeals has "recognized an equal protection right to be free from employment discrimination, . . . and [has] found various race- and gender-based employment decisions by public officials, including those concerning . . . discipline, . . . and termination, in violation of that constitutional right."  Id. (citations omitted).  Additionally, Eleventh Circuit precedent establishes that a "person acts under color of state law when he acts with authority possessed by virtue of his employment with the state."  Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

In this action, Brown alleges claims of discrimination premised on a theory of disparate treatment in that she alleges that Defendants took a number of actions against her because of her race and gender.  See Reeves v. C.H. Robinson Worldwide, Inc., 594

---

[14] Bare and self-serving allegations in a complaint are inadequate to carry the plaintiff's burden on summary judgment.  Shuler v. Bd. of Trustees of Univ. of Ala., 480 F. App'x 540, 544 (11th Cir. 2012); see also Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 840 (11th Cir. 2000) (plaintiff may not rest upon the mere allegations of its pleadings in opposition to defendant's motion for summary judgment).  "[T]he purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC, 714 F.3d 1234, 1237 (11th Cir. 2013) (quotation omitted).  However, the allegations set forth in the Amended Complaint frame the issues presented here.  Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1227 (11th Cir. 2013) (summary judgment must be based on the claims and defenses presented in the complaint and answer).

F.3d 798, 807–08 (11th Cir. 2010).   A plaintiff may establish a disparate treatment discrimination claim through the introduction of direct or circumstantial evidence.[15]  Lee v. U.S. Steel Corp., 450 F. App'x 834, 839 (11th Cir. 2012) (citing Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010)).[16]  Where, as here, the plaintiff relies on circumstantial evidence of discrimination,[17] the Court applies the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Alvarez, 610 F.3d at 1264; Hawkins v. Potter, 316 F. App'x 957, 960 (11th Cir. 2009).

---

[15] Discrimination claims brought under Title VII and Section 1983 "have the same elements where the claims are based on the same set of facts." Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1275 n.5 (11th Cir. 2008).  Thus, case law interpreting equal protection violations under a Title VII framework is equally applicable to Brown's Section 1983 claim.

[16] "Although an unpublished opinion is not binding . . . it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[17] Brown does not argue that she has any direct evidence or statistical proof of discrimination. Response at 11.  A plaintiff may "present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude."  Hill v. Metro Atlanta Rapid Transit Auth., 841 F.2d 1533, 1539 (11th Cir. 1988), amended on reh'g on different grounds, 848 F.2d 1522 (11th Cir. 1988). "Direct evidence is that which shows an employer's discriminatory intent 'without any inference or presumption.'" Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000) (quoting Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)).  However, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination. Carter v. City of Miami, 870 F.3d 578, 582 (11th Cir. 1989).

    The Court recognizes that Brown alleges that Davis called her "that white girl" and "whitey," arguably evincing his discriminatory animus.   Brown Dep. at 91, 92. However, she does not contend, and the Court does not find, that these remarks constitute direct evidence of discrimination.  See Akouri v. State of Fla. Dept. of Transp., 408 F.3d 1338, 1348 (11th Cir. 2005) (finding a statement from an employer that a Lebanese employee was not promoted because the other employees "are all white and they are not going to take orders from [someone with] an accent," was direct evidence of discrimination because the employer "blatantly state[d] that the reason [plaintiff] was passed over for the promotion was his ethnicity," and thus "the statement relate[d] directly to the DOT's [employment] decision").  Moreover, the Court will not consider these remarks as circumstantial evidence of discrimination because Brown did not personally hear the remarks and could not recall who told her Davis said those things. Id. at 95–97. There is no testimony, nor any affidavit or declaration, in the record from any person attesting to have personally heard these remarks. Thus, the alleged remarks are hearsay that the Court will not consider in ruling on the Motions.  "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Reese v. Herbert, 527 F.3d 1253, 1271 n. 29 (11th Cir. 2008) (quoting Macuba v. Deboer, 193 F.3d 1316, 132 (11th Cir. 1999)).

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). If the plaintiff presents a prima facie case of discrimination, that evidence "creates a presumption that the employer unlawfully discriminated against the employee," and the burden of production then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254–56 (1981); Alvarez, 610 F.3d at 1264.

If the employer meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination and was not the "true reason for the employment decision." Burdine, 450 U.S. at 256; see also Alvarez, 610 F.3d at 1264; Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) ("[T]he plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination.") (citing McDonnell Douglas, 411 U.S. at 804)). A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256 (citing McDonnell Douglas, 411 U.S. at 804–05). "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant[s] intentionally discriminated against

her." <u>Alvarez</u>, 610 F.3d at 1264.  Notably, the Eleventh Circuit has observed that the inquiry does not center "on reality as it exists outside of the decision maker's head."  <u>Id.</u> at 1266.  Rather, the pretext inquiry focuses on "the employer's beliefs, and not the employee's own perceptions of [her] performance."  <u>Holifield</u>, 115 F.3d at 1565.

### A. Equal Protection Claim against Davis (Count I)

In seeking summary judgment, Davis argues that Brown failed to establish a <u>prima facie</u> case of discrimination, that she cannot establish that the legitimate reasons LCPD proffered for her termination were pretext for discrimination, and that because he was not a decision-maker regarding Brown's termination, he cannot be held individually liable for any alleged discrimination.  Davis Motion at 18–22.  Regarding whether Brown established a <u>prima facie</u> case of discrimination, the parties do not dispute that Brown, as a white female, was a member of a protected class, that Brown was qualified for the job she held, or that she suffered an adverse employment action.  <u>Id.</u> at 20.  However, the parties dispute whether other similarly situated employees outside Brown's protected classes were treated more favorably.

Davis contends that Brown has not made out a <u>prima facie</u> case of discrimination under the <u>McDonnell Douglas</u> framework because she has not shown that Davis treated her less favorably than any similarly situated person outside her protected class.  <u>Id.</u> Brown responds that she established Shallar, a male, as a comparator, because he committed similarly serious LCPD policy violations and was not terminated.  Response at 18; <u>see generally</u> Shallar Report.  However, she does not dispute that Shallar was never arrested.  Brown Dep. at 90.  Regardless of whether Shallar is an appropriate comparator, "failure to produce a comparator does not necessarily doom the plaintiff's

case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  If the plaintiff presents "a convincing mosaic of circumstantial evidence" to raise a reasonable inference that the decision maker acted with discriminatory intent, summary judgment against the plaintiff is improper.  Id. at 1328.  Whether analyzing Brown's claim under McDonnell Douglas or otherwise, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253.

Defendants, pointing to the Termination Letter, articulated five legitimate, non-discriminatory reasons for terminating Brown's employment.  Davis Motion at 3, 22; see also Termination Letter; Tunsil and LCPD Motion at 15–16.  Thus, the Court will assume, without deciding, that Brown has established a prima facie case of race and gender discrimination based upon circumstantial evidence.  See Armindo v. Padlocker, Inc., 209 F.3d 1319, 1321 (11th Cir. 2000).  The Court's next task is to determine whether there is a genuine issue of material fact as to the question of pretext.

In order to show pretext, a plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision."  Burdine, 450 U.S. at 256.  A reason cannot be a "pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original, quotations omitted).  So long as the employer's "reason is one that might motivate a reasonable employer, [the] employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. Al Transport, 229 F.3d 1012, 1030 (11th Cir. 2000); see also Alvarez, 610 F.3d at 1256 ("[The Court does] not sit as a

'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive.") (quoting Chapman, 229 F.3d at 1030).  In this regard, an "employer may [take action against] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  Walton v. Cives Corp., 491 F. App'x 29, 32 (11th Cir. 2012) (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)).  A plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).

Significantly, at this stage, the plaintiff's burden of demonstrating that the employer's proffered reason was not the true reason for her termination "merges with the [plaintiff's] ultimate burden of persuading the court that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256.  Thus, "the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." Smith, 644 F.3d at 1325.  In this respect, while the absence of a comparator is not fatal to Brown's § 1983 claims, the presence or absence of a comparator is relevant, as is other circumstantial evidence, to whether the plaintiff has proven that the adverse employment action was the result of discrimination.  Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1154 (11th Cir. 2005); see also Burke-Fowler, 447 F.3d at 1325 (affirming district

court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination").

Pointing to the Termination Letter, Defendants assert five legitimate, non-discriminatory reasons for terminating Brown's employment:

(1)   You had several complaints (4) filed against you in a short time span.
(2)   You had several serious policy violations which were sustained.[18]
(3)   Your arrest and actions brought discredit to you, and this agency.
(4)   You had two domestic disturbances at your residence within 4 months.
(5)   Your behavior creates a liability for the City of Lake City.

Termination Letter.[19]   Because LCPD offered multiple reasons for terminating Brown's employment, Brown must sufficiently rebut each reason.   Indeed, the Eleventh Circuit has unequivocally stated that if a plaintiff does not "proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." Chapman, 229 F.3d at 1024–25 (emphasis added); see also Cobb v. City of Roswell, Ga. ex rel. Wood, 533 F. App'x 888, 895–96 (11th Cir. 2013) (when an employer cited budgetary concerns and a short deadline as reasons for the adverse employment action, although the plaintiff "persuasively rebut[ted]" the deadline reason, it did not rebut the

---

[18] As discussed supra, Blanchard sustained the policy violation against Brown for the Speeding Ticket IA more than one week after Brown's termination.  Speeding Ticket IA at 6.  Thus, the Court cannot consider the level 5 violation for Departmental Records/Stealing/Forging as a reason for terminating Brown's employment.  The Termination Letter identifies four internal complaints against Brown (the Bradley arrest, the computer damage, the speeding tickets, and the domestic violence incidents).  The Court will consider the complaint against Brown for the Speeding Ticket IA, but not the level 5 violation for "Departmental Records/Stealing/Forging," to be a reason for her termination.

[19] LCPD gave Brown a notice advising her of the pending disciplinary action against her on August 25, 2009.  Tunsil Dep. at 42.  This notice cited the same five reasons for disciplinary action and also stated that "[t]he conduct described above, individually or in any combination, constitutes just cause for your termination."  Id. at 48.

26

budgetary concern reason, and thus, because the plaintiff "did not rebut all of [the employer]'s proffered reasons, . . . the district court properly granted summary judgment").

Brown makes several arguments to support her contention that the reasons Defendants gave for terminating her employment were a mere pretext for discrimination. Brown argues that she received positive employment feedback and reviews up until Davis "assumed power of the police department." Response at 12.[20] She asserts that Davis did not want LCPD to hire her because he promised the position to Greg Williams, a black male who he eventually hired the same day that LCPD terminated Brown's employment. Response at 2; Brown Dep. at 98–99; Davis Dep. at 75. Additionally, Brown points to evidence that it was known to LCPD officers that Davis did not like working with females and did not approve of women working at LCPD. Brown Dep. at 91–92; Blanchard Dep. at 67–70. Brown contends that because of this bias, Davis targeted her, ordered other officers to file reports against her, and pressured Blanchard to sustain Internal Affairs violations against her. Response at 3; see also Blanchard Dep. at 50, 75, 77–78; Shallar Report at 20–21. Finally, Brown introduced evidence that while police were called to her home in two incidents of domestic violence, she was the victim of both, called the police to her house both times, and was not arrested or charged with a crime on either occasion. Brown Dep. at 61–75, 162–168. Tunsil himself admitted that "[i]t would be questionable" whether LCPD could terminate an officer's employment for being a victim of domestic violence. Tunsil Dep. at 49. Brown argues that Davis's dislike

---

[20] Because Davis agreed with this positive assessment, the evaluation does little to support Brown's contention that Davis's subsequent mistreatment of her was motivated by her race or gender. Probation Memo (noting that Davis "[c]oncur[red]" with the assessment).

of women and targeting of Brown is evidence that the investigations, the sustained policy violations, and the domestic violence incidents as reasons for her termination are merely pretext for Davis's discriminatory animus.  Response at 14–17.

Brown also points to the letter that Davis wrote to her in February of 2013 regarding his "involvement in the Internal Investigations against [her]" opining that "Brown was treated unfairly, and not equal, compared to what other officers have done."  Davis letter dated February 10, 2013 (Doc. 76-1; Davis Letter).  Although at his deposition, Davis disavowed the statements in his letter, and denied that there was any unwritten policy allowing officers to dispose of marijuana without charging the individual with possession, see Davis Dep. at 89–93, the Court views the facts in the light most favorable to Brown.

On this record, Brown has pointed to evidence creating a genuine issue of material fact as to the question of pretext with regard to the Internal Affairs investigations, the sustained policy violations, and the domestic violence incidents as reasons for her termination. However, Brown fails to rebut the proffered reason that her "arrest and actions brought discredit to [Brown], and this agency."  Termination Letter.[21]  As discussed supra, to avoid summary judgment, Brown must rebut each proffered reason. Chapman, 229 F.3d at 1024–25; see also Cobb, 533 F. App'x at 895–96.  In recommending that Brown's employment be terminated, Davis and Tunsil explained that any of the five reasons, "individually or in any combination, constitutes just cause for your

---

[21] Brown's Response also failed to address the fifth reason proffered in the Termination Letter, that her "behavior creates a liability for the City of Lake City."  Termination Letter.  However, viewing the facts and arguments in the light most favorable to Brown, the Court will accept her arguments that the proffered reasons of the Internal Affairs investigations, the sustained policy violations, and the domestic violence incidents were pretext for discrimination as equally applicable to the reason that some undefined "behavior" of Brown created a liability for the City.

termination." Tunsil Dep. at 48; see also Davis Dep. at 65. Moreover, Tunsil explained that the Human Resources Manager and the City Manager stated that if Brown was arrested, LCPD would be required to terminate her. Tunsil Dep. at 53–54.

While Brown asserts that "[u]ltimately, the criminal charge[] w[as] dropped" and "[n]o other officers were investigated for following the departmental practice," see Response at 15, these arguments are unavailing. Preliminarily, the Court notes that LCPD did not rely on a conviction as a reason for the termination. Rather, it identified Brown's arrest and the fact that the arrest brought discredit to the agency. See Termination Letter. While it is true that the criminal charge ultimately was dismissed following a mistrial, it is equally true and undisputed that Brown, in fact, was arrested. Information; see also Brown Dep. at 48–49, 77. Regardless of whether Brown destroyed the marijuana pursuant to an unwritten LCPD policy, as she states, or whether the FDLE concluded that no criminal charges should be filed against Brown, the State Attorney saw things differently. It is undisputed that the State Attorney independently opted to investigate and charge Brown regardless of the FDLE's recommendation, and that after he obtained a warrant, Brown was arrested. Brown Dep. at 48–49, 60, 77, 143–44. Whether the State Attorney's decision to investigate and arrest Brown was vindictive, as Davis suggests, is of no moment as it casts no doubt on Defendants' evidence that Brown's termination was a result of that arrest. See Davis letter, Termination Letter.

Notably, Brown does not dispute that neither Davis, nor Tunsil, nor any officer with LCPD had anything to do with the State Attorney's Office's decision to criminally investigate, charge, and arrest her. Brown Dep. at 48–49, 60, 77, 143–44 (when asked "Do you see a distinction between Jarvis and LCPD when it comes to the criminal

proceedings?", Brown responded: "Right.  I think it's totally different as far as the criminal proceedings.  But . . . the employment, to go back to that, the termination part, also a lot of people won't hire me because if someone has been terminated, as opposed to resigning, that doesn't look good for me either."); see also Davis Dep. at 99.  Nor does Brown suggest that the arrest of an officer would not be a legitimate reason for termination.  Indeed, Brown failed to identify any officer in the history of LCPD that was arrested and not terminated,[22] and Davis testified that he was not aware of any officer who was charged with a felony that LCPD did not terminate.  Davis Dep. at 95.[23]

In attempting to show pretext with regard to her arrest as a reason for her termination, Brown focuses on the Internal Affairs investigation of the Bradley arrest.  She argues that no other officers were investigated for destroying misdemeanor amounts of marijuana and that Davis improperly ordered Blanchard to focus his investigation on Brown, and not Officer Golub.  These arguments ignore the fact that Brown's arrest constitutes a separate, legitimate reason for termination, independent of the internal investigation, and Brown points to no evidence rebutting her arrest as a legitimate reason for LCPD to terminate her employment.

---

[22] Although Brown is not required to produce a comparator to present a prima facie case under the McDonnell Douglas test, the existence of a comparator, or lack thereof, is relevant to whether Defendants' proffered reasons for termination are pretextual. See McDonnell Douglas, 411 U.S. at 804–05 (stating that evidence that the employer treated others outside the plaintiff's protected class differently with respect to adverse employment actions would be "[e]specially relevant" to prove pretext).

[23] Davis also testified that in his nearly twenty-year career as an officer with LCPD, he had never "seen an officer get arrested, period, that did not get terminated." Davis Dep. at 104. Davis could not recall any officer who was arrested for a felony committed in the course and scope of the officer's employment. Id. at 105. Davis did recall that a Derrick Hendon had been terminated from LCPD, but could not remember if Mr. Hendon had himself been arrested, or whether Mr. Hendon had merely been somehow associated with a crime. Id. at 104. Davis also recalled officers that were terminated after being charged with DUIs. Id. at 104, 108–09.

Brown argues that she should not have been arrested because she acted pursuant to LCPD policy and that her employment should not have been terminated as a result of that arrest.  But, it is not the role of the Court to examine the wisdom of either the State Attorney's Office to charge Brown with a crime, or the wisdom of LCPD's decision to terminate her because of the arrest.  See Chapman, 229 F.3d at 1030; see also Alvarez, 610 F.3d at 1256 ("[The Court does] not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive.").  Moreover, "an employee must meet the employer's stated reason 'head on and rebut it, and [the employee] cannot succeed by simply quarreling with the wisdom of that reason.'"  Joseph v. Columbus Bank and Trust Co., 447 F. App'x 110, 112 (11th Cir. 2011) (quoting Alvarez, 610 F.3d at 1266)).  This Brown has not done.  It is undisputed that Brown was arrested, and she points to no evidence suggesting that a reasonable employer would not find the arrest of a police officer to warrant termination.  See Chapman, 229 F.3d at 1030.  Because Brown has failed to create a genuine issue of material fact as to her termination following her arrest, the Davis Motion is due to be granted and summary judgment entered in his favor as to Count I of the Amended Complaint.[24]

## B.  Equal Protection Claim against Tunsil (Count II)

Tunsil argues that Brown cannot establish a prima facie case of discrimination because there is no direct evidence to support her claim and because she failed to

---

[24] Even assuming that Davis had the power to effect Brown's termination, Brown has not met her burden in establishing that Davis proffered her arrest as a reason for her termination merely as a pretext for discrimination.  Thus, the Court need not address this alternative basis for entry of summary judgment.

identify a similarly situated employee outside her protected class who was treated more favorably.  Tunsil and LCPD Motion at 10–15.  Tunsil also argues that LCPD proffered legitimate, nondiscriminatory reasons for Brown's termination and that Brown cannot establish pretext as to those reasons.  Id. at 15–17.  Finally, Tunsil and LCPD argue that because Brown does not dispute that Tunsil did not discriminate against her, he is entitled to qualified immunity.  Id. at 9–10.  Brown's contention that Tunsil is liable for violating her equal protection rights rests solely on her allegation that Tunsil can be held responsible for Davis's acts of discrimination.  See generally Response.  Indeed, in her deposition, Brown was asked: "Did Carlton Tunsil take any action against you that you believed was discriminatory?" and Brown replied: "No. I believe he trusted Davis's opinion."  Brown Dep. at 109; see also, e.g., Response at 12–13 ("As a result of his discrimination, Defendant Davis made Ms. Brown the target of his attention and ultimately had her employment terminated.  Defendant Tunsil relied solely on the decisions of Defendant Davis in the investigations against Ms. Brown and in the decision to terminate Brown.").  Because the Court finds that summary judgment is due to be granted to Davis on Brown's discrimination claim, and Brown's claim against Tunsil is premised on identical facts, the Court finds that Tunsil's motion for summary judgment is due to be granted as to Count II of Brown's Complaint.[25]

### C.  Municipal Liability Claim against Lake City (Count III)

Brown's argument that the City of Lake City can be held liable relies wholly upon her theory that Davis was a "final decisionmaker" and terminated her employment

---

[25] Moreover, because the Court finds that neither Davis nor Tunsil discriminated against Brown, it declines to address Defendants' arguments that they are entitled to qualified immunity.

because of discriminatory animus. Response at 21–23. Because the Court finds that Brown has not met her burden of establishing that a reasonable jury could find that Davis terminated her employment based on discriminatory animus, the Court need not address Brown's arguments regarding the City of Lake City. See Beshers v. Harrison, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred.").

Accordingly, it is hereby

**ORDERED:**

1. Defendant Rudolph Davis's Motion for Summary Judgment (Doc. 69) is **GRANTED**.

2. Defendant Carlton Tunsil's and City of Lake City, Florida's Motion for Summary Judgment (a Dispositive Motion) with Supportive Memorandum of Law (Doc. 68) is **GRANTED**.

3. The Clerk of Court is directed to enter **JUDGMENT** in favor of Defendants Rudolph Davis, Carlton Tunsil, and City of Lake City, Florida, and against Plaintiff Shea Rebecca Brown.

4. The Clerk of Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 24th day of November, 2015.

MARCIA MORALES HOWARD
United States District Judge

lc20

Copies to:

Counsel of Record